This morning, I'd like to offer a motion, and if Adam would please stand. I move the admission of Adam Hubbard, who is a member of the Bar, is a good standing in the highest court of California. I have knowledge of his credentials, and I'm satisfied that he possesses the necessary qualifications. I'll say on a personal note, just briefly, that it's just been an absolute pleasure to have Adam a part of our chambers. And I won't leave out the most important part of Adam, which is his wonderful family, Kara and Ava and Jane. And it's just been wonderful to have them part of our chambers. We look forward to an industrious career. Adam worked for, as a clerk, for another judge in California, and now he's moving on to Colorado. And we wish him every success, and we have every expectation that he will do extraordinarily well in his career and personal life. Do I observe any objections to the position? I do record in that case, with great pleasure, I grant the Chief Judge's motion. Welcome to the court. Please raise your hand. You solemnly swear you will support yourself in affirming the counsel of this court, apply to it in accordance with the law, and to the support of the Constitution of the United States of America. I do. Congratulations. Welcome to the court. Thank you. Welcome to the court. The first case for argument this morning is 14-1545, Enri Rodriguez LaFrosse. Ms. Larson. Thank you. My name is Marina Larson. I'm with the firm of Larson and Anderson LLC in Silverthorne, Colorado. We wish we were getting this East Coast. This is now there rather than out here. You can have all of it that you want. Well, we know where to put it and what to do with it. I'm here today on behalf of the inventors, who I can't pronounce either, University of British Columbia and the licensee, Oncogenics. This is kind of an odd case because the cases moved around a lot. The examiner didn't argue the same things that the board did. But it really, in some level, comes down to a very basic consideration of obviousness. When we look at obviousness, we want to see that the art has all the elements, and that seems to be the case here, that there's a motivation to combine the elements or to modify those elements to get to the claimed invention, and that there's an expectation of success. Those last two, to some extent, go together. They're different, but they modify each other. The expectation of success has become something of a catchword. Oh, it doesn't have to be absolute. It only has to be a reasonable expectation of success. And that's the answer in the patent office when you argue that there isn't an expectation of success. That's the examiner, the board, will tell you. Well, it doesn't have to be absolute. It only has to be reasonable. Well, what would you say it has to be? Well, if you go back to the case where the CCPA actually said what it was, it was a high probability of success. The very next case in the sequence goes to reasonable expectation, but cites to that Panzer case. What it does need to be is it needs to be more than a coin flip. It needs to be more than a possibility. So how are we supposed to ascertain whether we're at a coin flip stage or at a high probability of success? I think we need to look at the entire record, and we need to do what this court has said on any number of occasions, is if you start with a prima facie case to get it going, then once the record is complete, you need to go back and start over. You need to look at all the references, all the arguments, the new lights, to see if there really is a reasonable expectation of success. That's not what the examiner did here. In fact, the examiner argued strenuously that the art was totally unpredictable, citing one set of references, and then used a totally different set to say it was absolutely predictable, or at least reasonably predictable. And the examiner would not consider those other references. The Board of Appeals did and came up with arguments that were new. We asked for – But what argument was new? In particular, the argument that these references, that the Fortin and Suzuki and other references didn't really count because they had a – Yanakura and Timurian had a common mechanism of action, that is, they interfered with apoptosis. The implication there was that that wasn't the mechanism of action in Yanakura and Suzuki. You mean Fortin and Suzuki. Fortin and Suzuki, rather. But in point of fact, we only have two ways to kill cells, apoptosis and necrosis. The mechanisms that are in those references are, in fact, very different. It's a little bit like saying, yes, they have a common mechanism of metabolism. They're both aerobic. That covers slime molds and us. There's a lot different there. And had we had the opportunity, had that been an argument that the examiner had made, we could have put in a declaration. We could have put in arguments pointing those out that, really, there's many, many pathways to apoptosis, and that there is no commonality shown in those references. More importantly, though, we have a case where one set of references says that this cancer is benefited by HSP27, and the other set of references says it's not. It's benefited by the absence of HSP27. Neither reference says anything about radiation therapy. They're both in the context of chemotherapy. Well, tumourin, of course, is in the context of radiation therapy. But it's the wrong cancer. Well, it's a different cancer. It's a different cancer. It says that this may be applicable to cancers in general. But it may be.  It may not be. Why isn't that a motivation to combine? That may get you to the motivation to combine at some level if there weren't any conflicting evidence about what was going to happen when you did that combination. I don't know whether or not... To start with, I don't know for sure what the response in terms of HSP27 production is going to be in squamous cell carcinoma to radiation. I know that in the case of chemotherapy, it appears that some is one way and some is the other. Yes, these are different ways of killing cells. They're apoptotic. But they get to apoptosis a very different way. Isn't the real question, the issue raised by the examiner, whether it was obvious to try this combination? I think that obvious to try has to be looked at in the context of expectation of success. If obvious to try means, well, goodness gracious, wouldn't it be wonderful if we had a better treatment for this cancer? And we'll try almost anything to get there. But if we don't... Because it doesn't cost very much or it's pretty easy. But this isn't almost anything. These are two more or less standard treatments. But we have two very different results being reported for squamous cell carcinoma. And the examiner selected the art that supported the rejection. The examiner and the board did not go back and look at the art as a whole. They looked at the warts on the art that was being presented as a challenge. And they didn't look at the warts on the art that made up the prima ficia case. They set that case on a pedestal. They made it very special. And they said, you have to attack that. And that's contrary to this court's holdings. That you're supposed to go back. You're supposed to notice that the very statement that's badly cited in the one reference is made and correctly cited in the reference you're relying on. That is, there is no showing of a relationship between HSP27 and radiation. Presumably, if one went back and looked at that reference, one would see that that is, in fact, showing that there is no connection in squamous cell carcinoma. I've lost your train of argument there. What's the reference that you say says there's no relationship between... Temorium. Between HSP and radiosensitivity? Prior to their study, there wasn't. But their study established a relationship. Only in prostate cancer. Well, okay. But I thought you were saying, well, there was other art that said there was no relationship. There is. It's a Fortin reference. But Fortin, it seems to me, is a difficult reference for you to rely on. Because, as the board pointed out, the Fortin citation for that was inapposite. And you argue in your brief, but as far as I can see, did not argue before the board, that that was just a miscitation and the Fortin reference should have cited something else. But as far as the board was concerned, whether the board made a mistake in discounting Fortin, the board pointed out, I think, that the reference that Fortin relied on was just inapposite. You would agree with that? Yes. You would agree that it was inapposite? Yes. In fact, I made that statement. I said, I can't rely on this statement in Fortin. So that sort of takes Fortin off the table, doesn't it? Well, no. Because that was only one statement about what went in the art. The entire rest of the reference talks about how they didn't find a correlation between HSP-27. Actually, they did find a correlation that HSP-27 was a good thing to have if you were treating squamous cell carcinoma. You're talking about Fortin 2001, right? Yes. Okay. And Suzuki says the same thing, that there is this absolute diametric offset between what one set of references says and what another set of references says in the context of squamous cell carcinoma and chemotherapy and HSP-27. One set says HSP-27 is good. The other set says HSP-27 is bad. Since Panzer, no court has ever said that I could find anything more quantitative than reasonable expectation of success. And reasonable is one of those awful words. It's kind of like substantial. It either means more than something or less than something, depending on how you use it. But in this case, I think reasonable expectation means a fair level of belief, a reason to believe that you're going to end up with a certain result. And here, I think that the fact that there were two very separate observations in the cancer we're talking about with chemotherapy leads to it is a coin flip. I don't know what's going to happen, whether it's going to be a good thing to get rid of HSP-27 or a bad thing. Nothing in the art, if you look at it as a whole, leads me in either direction to any significant extent. In fact, if there's any bias, it would be based on the fact that Suzuki's in real patients. It's in real tumors. Whereas both Tamorian, Tamorian's in a cell line. It's been artificially modified to make HSP-27 to see what happens, to do studies. It's not in real people. It's not in real cancers. We're into your rebuttal, so why don't we save it and hear from the government. Thank you. Thank you. May it please the court. This is an obviousness case based on express teachings in both of the prior art references that would lead an ordinary artisan to arrive at the claimed invention that… How do we know that? Why is this more than a coin flip? I assume you would think that this is more than a coin flip. Yes. Yes, I do. The reason for that is because if you look at the two primary references of record, Yanakura and Tamorian, Yanakura shows you that in the exact sort of cells that they're seeking to claim, which are squamous cell carcinoma cells, that reduction of HSP-27 sensitizes those cells to apoptosis. Then Yanakura goes on to show that those cells are more susceptible to being killed by chemotherapy. Then you have Tamorian, which teaches that you can also use radiation therapy to kill sensitized cells. For these cell lines, which are squamous cell carcinoma cells, we know that they are affected by lowering levels of HSP-27. You have a reasonable expectation of success when you have all of these teachings in the prior art. Really, just one more step that it actually needs to be performed, but based on these teachings, you'd have every expectation that it would work. What do you make of Suzuki? How should we think about the Suzuki art vis-a-vis the two pieces of art on which the board principally relied? The Suzuki reference, the board characterized it as unpredictable. They made that finding a fact in the enablement context. That was a finding that it taught both that HSP-27 expression could be good and that it could be bad. It said unpredictability or ambiguity, but significantly it found when it got to the legal conclusion of enablement that there wasn't so much unpredictability that the full scope of the claims couldn't be enabled. Then turning to obviousness, it reached a similar conclusion saying, yes, Suzuki does suggest that both things can happen with HSP-27, but in light of the clear teachings of Tamorian and Yonakura, you'd know at least it would work in these particular cell lines. I think that goes back to what the examiner's rationale was, although it wasn't necessarily explicitly stated. You see this happen a lot in prosecution where you have an enablement rejection for the broad scope of a claim, but then you have an obviousness rejection that looks at a particular area that the prior art might have practiced or might have rendered obvious. The examiner was saying that Suzuki suggests that across the range of squamous cell carcinoma cells, which are cells that can be in various organs of the body, maybe you wouldn't know how all of them would react. That was the examiner's position that the board reversed. But on the other hand, when you look at Yonakura and they've looked at particular types of squamous cell carcinoma cells, you know how those cells are going to respond. And that's why you have both an obviousness and an enablement rejection. So here we have a crowded field. We have a deadly disease. Combination therapies have been known and have been tried in a lot of areas, and nobody had plucked out of the prior art this particular combination, which turns out to be quite effective. And so if it was so obvious, what took them so long? I mean, again, when you are in the middle of a lot of experimentation and a lot of concern, and yet this one particular approach is not in the prior art, the only thing that makes it obvious is, with hindsight, looking at the result. Your Honor, I think in this case, what's notable about it and why I think the obviousness rejection should be affirmed is that applicants didn't try to even submit any objective evidence of non-obviousness. In a lot of the cases where a combination therapy might have looked like, with hindsight, it would be obvious, the applicants were in district court, the litigants submitted evidence that would show exactly why the prior art hadn't tried it. There's none of that here, and I think that's very notable. So I think in contrast to some of those other cases, the case for obviousness is stronger here, where you don't even have an attempt to show that there's any objective indicia of non-obviousness. And for something like combination therapy, I think that that evidence would be particularly helpful if it's available to show that you're not looking at this with hindsight. And again, although the prior art might not, at least with the records we have, might not have done this previously, Yonapura came pretty close. They just didn't, they used chemotherapy instead of radiation therapy. And I'd also like to point out that I think the facts of this case are very close to In re O'Farrell, and I think that case also talked about the reasonable expectation of success, and while it might not have put a lot of explanation to what reasonable means, I think the facts of that case are instructive. So in that case, it was also in the biotechnology field, and there was a lot of teachings in the prior art about whether or not you could express a protein in cells. And the prior art hadn't really done it with a DNA sequence, it had done it with something that was short of that, and then the inventors came back and they tried to get an invention to expressing the full protein. And they argued that biotechnology was a very unpredictable field, and until you actually did it, you had no reasonable expectation of success. And this is the case where the court said that it doesn't need to be an absolute expectation of success, it needs to be a reasonable one. And I think if you look at the facts of that case compared to here, they're very similar. The prior art did almost everything except try the exact combination that was here, and yes, biotechnology in general may be an unpredictable field, but when you have a lot of teachings in a particular area, unpredictability can't just automatically be a trump card. You have a sentence in your brief which I wanted to draw out a little from you. You say, and this is at page three, that squamous cell carcinomas can give rise to various cancers, including, rarely, prostate cancer. What's the relationship? Where I'm going with this is trying to see whether the reference in Tamurian to prostate cancer creates an overlap with the squamous cell carcinoma reference from Yantakura. What's the relationship between squamous cell carcinoma and the rare instances in which prostate cancer is associated with that carcinoma? My general understanding is that prostate cancers can be both from the squamous cell carcinoma source and from other sources. And on our record, there originally was a 103 rejection based on Tamurian alone. And the applicants came back and said there are different kinds of prostate cancers, and they contested whether or not Tamurian showed squamous cell carcinoma. And so the examiner reversed their rejection and instead relied on Yantakura and Tamurian. Okay, but was that reversal based on the examiner's conclusion that the particular type of prostate cancer that was the subject of the Tamurian investigation was not squamous cell type? There was no explicit finding, but that was the argument of applicants. So I think it's fair to say that you didn't contest it. And if there are no further questions, we have the rest of my time. Thank you. Just for clarification, Your Honor, the cell line used in Tamurian was an adenocarcinoma. Which is not squamous cell carcinoma. We have cell types, and then we have where they are. Right. And prostate, unfortunately, gets called prostate frequently no matter what kind. But in this case, it was clearly a cell line. It wasn't in patients, and it wasn't adenocarcinoma. That's clear in Tamurian? Yes. Okay. I just wanted to comment. I made a note of this. It's kind of ironic that the alleged unpredictability found within the Suzuki reference is used as evidence of predictability. I would also point out that Ms. Simpson acknowledged that certain arguments were not explicitly stated by the examiner. Which sounds to me like a new ground of rejection at the Board that I should have an opportunity to respond to if the rejection is not reversed. I'd also like to ask, what objective evidence would I put in? This isn't a case where I can test A and see if it works, and test B and see if it works better. Because they're different. There is... What would I compare it to? The fact that what's unexpected, what's unobvious, what there is no expectation of success is, is that it works at all.  I don't have anything to compare it to. I can't compare it to chemotherapy alone, or radiation alone. Because I've been told... I have radiation in HSP27 in one, and I've been told that it is expected that it's going to work. And chemotherapy and radiation aren't comparable in terms of how effective they are. It's not like I'm taking a drug and adding something else to it. I am changing the drug. I am changing the treatment. I don't expect them to work exactly the same. And finally, this is not O'Farrell. Because here we have general... In O'Farrell, we had generalized unpredictability of the art. Here we have very specific. Art says A, art says not A. Which one do you choose? Thank you. We have the argument. We thank both counsel and the case is submitted.